## Harris Cohn, et al., v. Rosa Pitzele, et al.

### Gen. No. 11,650.

1. ACCOUNTING—*when statement of master in, erroneous.* Where in stating an account the master disallows items which had been agreed upon by the parties prior to litigation, his action is erroneous, it appearing that such parties had a right to make such agreement.

2. JUDICIAL SALE—*fraud not presumed with respect to.* Where a sale and conveyance is the act of a court of general jurisdiction in a case in which it had jurisdiction of the subject-matter and of the parties interested, fraud not being proved, will not be presumed.

3. CLEAN HANDS—*when equitable doctrine of, does not apply.* Where the complainant, in order to maintain his action, is not required in the first instance to rely upon an antecedent illegal transaction, the equitable doctrine which requires that he should come into a court of equity with clean hands does not apply; in other words, where the complainant's right to maintain his action is dependent upon a new undertaking based upon a valid consideration in which the original illegal transaction is merged, he may be heard and given relief notwithstanding such illegal transaction may appear in the course of the proceeding.

Foreclosure proceeding. Appeal from the Superior Court of Cook County; the Hon. JESSE HOLDOM, Judge, presiding. Heard in this court at the March term, 1904. Reversed and remanded with directions. Opinion filed December 15, 1904.

CHESTER E. CLEVELAND, for appellants.

B. M. SHAFFNER, for appellees.

MR. PRESIDING JUSTICE BALL delivered the opinion of the court.

Appellants filed a bill in the Superior Court to foreclose a trust deed executed and delivered by appellees to appellant Neuberger as trustee, dated March 28, 1900, conveying certain premises therein described, to secure the payment of a note for the sum of $2,000, of even date, due in three years, with interest at six per cent per annum, payable half yearly, evidenced by coupon notes.  The principal note and the coupons are severally to the order of appellant Cohn, and are signed by appellees.

The bill sets up a default in the payment of the interest coupon which fell due March 28, 1901, and alleges that under the terms of the trust deed appellant Cohn, the owner and holder of the notes and trust deed, had elected to declare the whole amount due.

The answer of appellees admits the execution of the notes and trust deed, as alleged in the bill, but denies that they are indebted to said Cohn, and avers that such notes were made without any consideration and by means of false and fraudulent representations made by Cohn to them.

Appellees set up that before the making of this incumbrance there was an action pending between Ascher and Nathan Pitzele, involving a dissolution of partnership between them and an accounting, in which suit a receiver had been appointed; that said Cohn had advanced and disbursed certain sums of money for said Ascher and Nathan Pitzele, in connection with certain real estate belonging to them, including the premises mentioned in this bill; that on the date of the notes and trust deed Cohn fraudulently represented to appellees that he had advanced over $2,000 in connection with said real estate, for which they were indebted to him; and they, confiding in such representations, executed and delivered the said notes and trust deed; that on the last-mentioned date said Cohn suppressed the fact, of

which appellees were ignorant, that he had received certain dividends amounting to $2,113.80, which he should have credited upon the account of the moneys he had so advanced; that although they had frequently asked said Cohn for an accounting, appellees were unable to obtain one; that in the moneys charged by Cohn against said Ascher and Nathan Pitzele is an item of $466.43 for attorney's fees, which item was personal to Cohn, and for which Ascher and Nathan Pitzele were in no way liable; and that upon a fair accounting it will appear that Cohn is indebted to Ascher and Nathan Pitzele.

The cause was sent to a master, who took the evidence, and June 25, 1903, reported his conclusions of law and of fact to the court. He finds that the notes and trust deed are valid obligations; that default in payment of interest was made as set forth in the bill, and Cohn, as owner and holder of the notes and trust deed, elected to declare and did declare the whole sum due; that there is due thereon $2,243.54, which is exclusive of the above attorney's fees and a small item of interest, and that appellants are entitled to a foreclosure and a sale of the premises for that amount.

"Finds there is evidence to the effect that several thousand dollars' worth of goods were shipped by the appellees from their Dixon house to South Chicago, and from South Chicago to appellant Cohn's place of business, and that these goods were to be sold by Cohn and the proceeds applied on the indebtedness from appellees to Cohn. This evidence is all contradicted, and it is impossible to say that the facts claimed by the defendants (appellees) are sustained by a preponderance of the evidence. After they claim to have shipped this large amount of valuable goods, the appellees made the papers sought to be foreclosed, and other notes, and there is no evidence sufficiently conclusive to overcome the presumption raised by these papers regularly and apparently fairly signed.

It is charged that appellant Cohn entered into a conspiracy with appellees to defraud their creditors by purchasing the property at the receiver's sale, and having the

Cohn v. Pitzele.

same turned over to the wives of appellees; appellees' counsel urges that the court should leave the parties where it finds them, and that no relief should be granted. No collusion with the receiver is shown. Appellant used the property in collecting his own debt, which was very large. At the date of the sale there were at least two large mortgages on the property, and it is not reasonable to suppose that any person would have bid more for property so encumbered. At most it can only be said that appellant acted with generosity to appellees' wives. Finds, therefore, there was no fraud in the transaction such as would bar the appellants from relief in a court of equity.

Finds all the material allegations of the bill sustained, and recommends that the prayer be granted," etc.

Appellants and appellees filed objections and exceptions to this report. October 15, 1903, the chancellor entered a decree, in which the objections and exception of appellees were sustained, and those of appellants were overruled; and the court finds " that the complainants do not and did not come into court with clean hands; therefore ordered and decreed that the bill be dismissed for want of equity at the cost of the complainants." Appellants prayed an appeal which was allowed.

For many years prior to October 15, 1898, Ascher and Nathan Pitzele as partners had been doing business as merchants, having one store in South Chicago and another in Dixon, Illinois. During all this time they had bought merchandise in large amounts from the firm of H. Cohn & Son of Chicago, of which appellant Cohn was and is the senior member. On that date, being heavily indebted to H. Cohn & Son, and to other merchants, Ascher Pitzele filed in the Circuit Court of Lee county, wherein Dixon is situate, a bill against Nathan Pitzele to dissolve the partnership of A. & N. Pitzele and to wind up its affairs. On the same day Nathan Pitzele filed an answer, admitting the allegations of the bill and consenting to the entry of a decree dissolving the partnership. Charles H. Hughes was at once appointed receiver of said firm, and as such took pos-

session of all the property thereof, including its real estate. Upon the real estate described in the bill herein there was a first mortgage for $8,000 held or represented by Chandler & Co., and a second mortgage for $5,500 owned by appellant Cohn. Upon another lot, known as the Lange lot, said Cohn had a first mortgage for $5,000, and a second mortgage for $1,250. Upon a third lot, known as the Appel lot, said Cohn had a mortgage for $1,250. All of this real estate was situate in South Chicago. In addition to these mortgages, A. & N. Pitzele then owed said H. Cohn & Son the sum of $2,373.78 upon merchandise account. H. Cohn and H. Cohn & Son proved up these several claims against the estate of A. & N. Pitzele. March 11, 1899, said receiver paid to H. Cohn and H. Cohn & Son dividends to the amount of $1,630.55; and on October 31, 1899, the further sum of $856.04. These dividends were pro-rated among the several claims and credited accordingly. In the meantime two interest coupons upon the Chandler & Co. mortgage became due, and to protect his underlying mortgage said Cohn purchased them and had them assigned to his attorney.

The receiver was directed by the Circuit Court of Lee County to sell said real estate. April 19, 1899, he filed a petition in said cause in which he says that, accompanied by one of his attorneys, C. B. Morrison, he went to South Chicago, examined the property (the real estate described in the bill herein and the Lange lot), and visited several real estate agents and business men in the vicinity, and became satisfied that the property was not worth more than enough to pay the valid mortgage held against it. That one of the mortgagees is willing to pay $100 for said premises, subject to all prior liens, in order to save the trouble and expense of foreclosure proceedings; and that the petitioner believes it is for the best interests of all concerned that such offer be accepted. An order was thereupon entered, directing the receiver to make such sale. April 20, 1899, the receiver reported that he had sold the property as directed to H. Cohn for the sum of $100, and

had made a deed therefor at his request to Charles A. Levy. Three days later an order was entered approving and confirming such report. While these lots were the property of the firm of A. & N. Pitzele the title thereto was in the individual members of that firm, and they had conveyed such title to the receiver. The action of the receiver and of the court in this regard was never questioned in that case. The Lange lot was sold to E. A. Lange for $9,000. The proceeds of this sale were credited to the merchandise and mortgage accounts of A. & N. Pitzele. At some time between October 15, 1898, and March 28, 1900, the question of conveying the real estate described in the bill of complaint to the wives of A. & N. Pitzele was mooted between the parties. Appellees claim that an agreement was made between them to that effect prior to the purchase from the receiver; while appellants say that nothing was said concerning such a conveyance until about the time the trust deed was executed. However this may be, it seems clear that the purchase price was to be and to include all the sums of money owing from A. & N. Pitzele to H. Cohn and H. Cohn & Son. A. Pitzele, who conducted the negotiations for appellees, testified: "Cohn told me he would make the deed to our wives provided he received all the money he had laid out." A first mortgage for $8,000 was placed upon the property by Baird & Warner, and the net amount received therefrom, $7,809.30, was paid to H. Cohn and credited upon the Pitzele accounts. Then, and as one transaction, Levy deeded the property to the wives of A. & N. Pitzele, and they, with their husbands, gave the notes and trust deed in issue in this cause, as a second incumbrance. At the time the notes and trust deed here involved were given, the balance due from A. & N. Pitzele to H. Cohn & Son was $2,870, unless one or more of the defenses here interposed is or are sustained. To pay and to evidence this balance appellee paid to appellants $500 in cash, and gave the principal note mentioned in the deed of trust for $2,000, and two short time unsecured notes for $185 each.

Appellees claim that shortly before the failure of the firm of A. & N. Pitzele twenty-one cases of goods were sent from their Dixon store to their South Chicago store, and were from there taken by wagon in lots of from one to six cases per load to appellants' place of business, to be applied, as is said, upon the accounts here involved. Appellees say that if these goods, amounting, as they claim, to about $4,000 in value, had been applied to such accounts they would have been fully paid at the time this incumbrance was given, and that therefore said notes were wholly without consideration.

We think the preponderance of the evidence is against this contention. It is probable that such goods were sent to South Chicago, but that they ever came into the possession of appellants is more than doubtful. The answer in this case specifically refers to dividends which were not credited to appellees, and to attorneys' fees which should not have been charged to them, but it does not mention merchandise or in any other way directly refer to this item of $4,000. Nothing was said about these cases when the Lange lot was sold for $9,000 and the proceeds paid to H. Cohn. Nor does it appear that such item figured in the settlement which preceded the making of the notes and trust deed here in issue. Ascher Pitzele says he saw the expressman haul all the goods. He either went with or preceded the wagon to the Cohn store. "The goods were put right in the back of the store, in the back door of the store, right on the first floor in the alley." * * * "When I took down more than one case at a time I took them all right in the same place, in the back door of Cohn's store. The expressman piled them up there and I handed the bills. The expressman took them inside and lay them down inside the store by the door; I saw them there." * * * "I didn't get any receipt for these goods, not for any of them." He says that these cases were delivered to Cohn's store from September 12 to October 13, 1898. " When I delivered these goods Cohn's store was on the same side of Market street that he is now; in the same

Cohn v. Pitzele.

store where I delivered them; I can't be mistaken about that; it is the same store he is in now, and in the back door of the store the goods were all put in; the expressman brought them in and laid them down there by the door, in the store in back; and that is all I know about it; I don't know what became of them; there was no receiving clerk there with me and Mr. Cohn at the time these goods were brought in; me and Mr. Cohn was standing in by the front radiator and we went back and the expressman brought in the goods and we were standing there when he brought them in, and I handed Mr. Cohn the bills of them; and that is the last I saw of the goods; I don't know whether Cohn checked it up; he never gave me any receipts." During the entire year of 1898, H. Cohn & Son occupied premises situate on the east side of Market street. It was not until January 1, 1899, that the firm moved into a building upon the west side of the same street. There was no alley in the rear of the former premises. All goods were delivered from the street and taken up to the store by an elevator. In the latter premises, which were still in the possession of H. Cohn & Son at the time Nathan Pitzele testified, there was an alley in the rear, and all goods were delivered from that alley and taken in on the main floor. Some two weeks after the foregoing testimony had been given, Ascher Pitzele was recalled and testified: "I made a mistake in delivering the goods; he asked me so quick the questions I didn't understand them exactly. The goods were delivered across the street where he lives now, from where he is in business now, yes; where the business was before, not the present place of business. The goods were delivered in front, Market street, and the elevator brought them up; we brought them in the store, that is all." This explanation is unsatisfactory. The recital of the alleged delivery of these goods from an alley which never existed is too circumstantial to be explained away. The attempted correction is futile, and justified the master and justifies us in paying little heed to the evidence of this witness. The expressman, Philip Felt, who is related to appellees, testifies

to the delivery of these goods, but in loads of never less than three cases at a time, while Ascher Pitzele swore that on September 12 he sent but one case. Charles Pitzele, a brother of Ascher and Nathan, testified that Mr. Cohn admitted to him that he had received some goods from A. & N. Pitzele, and that two cases were sent him at Fond du Lac, Wisconsin. In this regard he is corroborated by several witnesses, but the preponderance of the evidence is that Charles Pitzele assembled his purchases in Chicago at H. Cohn & Son's store, where he had bought certain other goods, and they were there packed in two cases, thus lessening the freight.

Nathan Pitzele, who had charge of the Dixon store, says he was in South Chicago when Felt took six of these cases to deliver to H. Cohn & Son, and that he followed and saw the goods delivered to and received by that firm.

These cases were about 4x4x6 feet in size. They contained over 2,000 cubic feet, and if laid flat they would occupy 504 square feet. Their presence in the store could not escape the observation of the employees; yet eight witnesses, including the shipping clerk, the stock keeper, the stock packer, the stock picker and three salesmen swear positively that such cases were never delivered to H. Cohn & Son, and were never in the store of that firm. These witnesses are unimpeached and appear to be disinterested. Appellant H. Cohn denies all knowledge of these goods, and declared that they were never delivered at his store, or in any other way came into his custody or control. He also denies the several conversations in which he is said to have admitted that he had these goods.

From a careful survey of all the evidence we have reached the conclusion that these cases were not sent to the firm of H. Cohn & Son.

Isaac J. Neuberger, the confidential man of H. Cohn & Son who had direct charge of the merchandise and the mortgage accounts between these parties from 1895 to and including the giving of the notes and trust deed in question, was called as a witness by both appellees and appellants.

His examination shows each and every item on each side of the accounts, including the receipt of the dividends by Mr. Cohn and the credit therefor to appellees at the time they were received. *Prima facie* his evidence justifies the claim of appellants that at the time these premises were conveyed to the wives of Ascher and Nathan Pitzele there was due from the latter upon these accounts, after crediting to them all dividends received, the sum of $2,870. Neuberger also testified that he told Ascher Pitzele at the time the Lange lot was sold for $9,000, that the dividends had been paid and the amount thereof; that in the negotiations which led up to the execution of the notes and trust deed he again told him about the payment of the dividends, and that before the notes and trust deed were drawn the entire transaction was gone over in the office of the attorneys for appellants with Ascher and Nathan Pitzele, and that the accounts as there discussed included the dividends. That Ascher and Nathan did not know in March, 1900, that months prior thereto, in the matter of their own estate, dividends had been declared and paid, is wholly improbable. That they, if ignorant, should not have informed themselves upon so important a matter, when the evidence was so easily obtained, before the negotiations were closed, is unreasonable.

We do not see why Mr. Cohn should desire any security for dividends that had already been paid and were shown upon his books to be credited to appellees. His claims had been on file in the matter of their estate since October, 1898. No one was contesting these claims or his right to receive dividends upon them. But if there still remained a balance of $2,870 due him from the Pitzeles, it would be natural for him to ask for the securing of that balance at the time he caused the title of these premises to be conveyed to the wives of Ascher and Nathan Pitzele.

The notes and trust deed in question are strong evidence that they truly represent the understanding and agreement of the parties, and state the account between them correctly. The Pitzeles were experienced business men in

merchandise, and in the giving of real estate mortgages. The parties were at arm's length. Appellees wanted the title to these premises. Appellants were desirous of securing the balance of the account due them, and were under no legal compulsion to convey these premises to any one. Thus situate, what the parties talked over and agreed upon is merged in the contract they then made, and that contract must stand, unless evidence that fraud, accident or mistake entered into it is clear and convincing.

Bernard Cohn, a mutual friend of both parties, not related to H. Cohn, swears that after the foreclosure suit had been commenced, Ascher Pitzele asked him to go with him, Ascher, to see Mr. Cohn to urge a settlement of the case; that Ascher said to the witness that he was an old man and did not like to go on the stand; that he owed H. Cohn "the money, that is true, but he don't like to pay the lawyer's fee and the interest;" that witness and Ascher called upon Mr. Cohn and talked of compromise, but that nothing came of it; that such an interview took place is testified to by H. Cohn, Mr. Schwerin, a salesman, and by Mr. Neuberger.

From the record we are convinced that these dividends were properly credited to appellees in the account presented to them before the notes and trust deed were executed, and that their defense in this particular must fail.

We are not in accord with the master upon the question of the attorney's fees which are included in this balance of the account. It seems clear from the evidence that appellants were to be made whole if the premises were conveyed to the wives of A. & N. Pitzele. It is true that such fees might have been omitted, but appellants presented them, and the account shows that they are included in the agreed balance. The parties to this transaction had the right to agree upon a purchase price, and having done so, it is not for the master nor for us to make a new contract for them.

What has been said as to the attorney's fees applies with equal force to the interest which the master disallowed.

When the Circuit Court of Lee county took charge of the

Cohn v. Pitzele.

estate of A. & N. Pitzele and appointed the receiver, the members of that firm conveyed the real estate in question to the receiver. That court in due course of administration, without objection so far as the record shows, authorized and approved a sale of said premises to Charles A. Levy. Months afterwards, by agreement of the parties, the wives of appellees took title to the premises, and as part of the consideration therefor appellees gave the notes and trust deed here in question. Appellees made no objection to the sale by the receiver, and took title under and through that sale. There is no evidence which tends to show any collusion between the receiver and appellants in or leading up to such sale, or at any other time. The sale and conveyance to Levy was the act of a court of general jurisdiction in a case where it had jurisdiction of the subject-matter and of the parties interested. Under these circumstances fraud, not being proved, cannot be presumed.

Further, in making the proof necessary for foreclosure in this case, appellants were not compelled to go back to the sale by the receiver. Indeed, evidence upon that question by them in the first instance would have been immaterial and irrelevant. It is only when the complainant, in order to recover, must show the preceding illegal transaction, that the doctrine of " clean hands " applies.

"If a plaintiff needs the aid of his illegal transaction, in any respect, to support his case, he cannot be heard. But here, the case of the complainants is in no way dependent upon the original unlawful transaction in regard to the lottery, but is wholly based upon the trust created by the deed from Mary J. Mitten to Guilfoil. A new contract, founded on a new consideration, although in relation to property respecting which there had been unlawful transactions between the parties, is not itself unlawful. Armstrong v. Toler, 11 Wheat. 258." Guilfoil v. Arthur, 158 Ill. 608. The same doctrine is laid down in Chicago v. Union Stock Yards, 164 Ill. 238, and in Mossler v. Jacobs, 66 Ill. App. 576.

The rule is thus stated in 11 Am. & Eng. Ency., 2nd ed.,

164:  " But while the force of the maxim that ' He who comes into equity must come with clean hands' is well established within certain limits, yet it is not every species of iniquity that will deprive a suitor of relief in chancery; for, as has been well remarked, most litigants are somewhat at fault, and all are fallible, and if this maxim were literally applied and carried to its furthest extreme, it would leave nothing for courts of equity to do.  It is therefore a qualifying principle, as well settled as the maxim itself, that the iniquity which will bar a complainant must be directly connected with the matter in litigation."  See, also, Shaver v. Heller & M. Co., 108 Fed. Rep. 821, and Trice v. Comstock, 121 Fed. Rep. 620.  It follows that even if there was collusion between Mr. Cohn and the receiver of the Pitzele estate, by means of which these premises and the Lange lot were conveyed to Levy for an inadequate consideration, that iniquity has no immediate or necessary relation to the case at bar.

We therefore reverse the decree of the Superior Court and remand the case, with directions to enter a decree of foreclosure for the amount found due, according to the tenor of the principal note and of the coupon notes unpaid.

*Reversed and remanded with directions.*